**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL NO. 5:21-62-KKC** |
| **Plaintiff,** | |
| **V.** | **OPINION AND ORDER** |
| **JUAN J. CAMPBELL, JR.** | |
| **Defendant.** | |

**\*\*\* \*\*\* \*\*\***

Defendant Juan J. Campbell, Jr. moves the Court to suppress (DE 14) evidence found during a search of a car he was driving. The parties briefed the motion, and the Court conducted a hearing and gave the parties an opportunity to file supplemental briefs.

Campbell argues that the officers stopped the car without reasonable suspicion, that they detained him for too long after the initial stop, and that there was no probable cause to search the car because the canine who conducted the sniff did not sufficiently alert. (DE 27, Post-Hr'g Br.) For the following reasons, the motion will be denied.

## I.    Facts

At the hearing, the following facts were established.

On either September 6 or 7, 2020, undercover narcotics detective Charles Johnson of the Lexington, Kentucky police department (LPD) received a tip from a "reliable" and "confidential" informant that someone was selling narcotics out of a particular room at the

SureStay hotel on Elkhorn Lane, which is off Winchester Road in Lexington, Kentucky. The informant further advised Detective Johnson that the person staying in the room had moved from a room at the front of the hotel to a room at the back of the hotel, where the doors opened to the outside.

Detective Johnson has been with the LPD for 21 years and with the narcotics unit for eight. He is familiar with the way drugs are bought and sold in Lexington and with the high drug-trafficking areas in the city. The informant had provided Detective Johnson with reliable information at least three times in the past that led to convictions. Detective Johnson had been to the SureStay as many as eight times before because of information indicating that it was the site of drug trafficking. As a result, the hotel had allowed him to remotely access from his phone and computer the footage from the hotel's security cameras.

After receiving the tip, Detective Johnson contacted patrol officer James Dellacamera to be on "standby." Officer Dellacamera has been with the LPD since 2006. Because Detective Johnson is an undercover officer, he does not have lights or a siren on his vehicle. Thus, Detective Johnson often contacts Officer Dellacamera to stop vehicles that Detective Johnson suspects to have been involved in drug activity. Officer Dellacamera drives a marked patrol car with sirens and lights. In addition, Detective Johnson believes him to be good with narcotics investigations. It is not unusual for a narcotics detective to asks a patrol officer to be available for an ongoing investigation.

At about 11:30 a.m. on September 7, 2020, Detective Johnson went to the hotel to conduct surveillance. From his phone or computer, Detective Johnson was able to view footage

from a hotel security camera that showed people entering and exiting the room. He saw people arrive on foot, knock, enter the room, and leave after a brief period of time. He knew this was consistent with drug activity.

He observed a black vehicle pull up to the back part of the hotel where the room was located. The vehicle parked in the general area of the door to the room. He saw a black male with a red shirt get out of the back seat, go into the room, stay a short time (about two minutes), and return to the vehicle. The same individual then stayed in the vehicle a short time, returned to the room, stayed a short time again (maybe 60 or 90 seconds), and then returned to the vehicle, which drove away.

Based on his training and experience, Detective Johnson thought a drug transaction had occurred. Thus, at about 11:24 a.m., he contacted Officer Dellacamera. Detective Johnson advised Officer Dellacamera that he believed the vehicle was involved in drug trafficking. Detective Johnson described the car to Officer Dellacamera, told him that one male in the car had on a red shirt, and advised him of where the vehicle was traveling. Detective Johnson also texted Tim Dawson, who was then a narcotics canine officer with the LPD. Officer Dawson was with the LPD for 20 years before retiring. He was assigned a canine named Ness when he joined the canine unit in 2018.

Detective Johnson followed the vehicle after it left the hotel and turned from Elkhorn onto Winchester Road. Officer Dellacamera then pulled up behind Detective Johnson. Campbell's car abruptly turned into a left turn lane on Winchester Road and turned left onto Patchen Wilkes Drive, which leads to a residential subdivision. Officer Dellacamera "definitely"

did not see a left turn signal on Campbell's car when it made the abrupt lane change. Neither did Detective Johnson.

Detective Johnson did not make the turn with Campbell's car because he believed Campbell would know he was following him. Instead, he kept going straight on Winchester Road, made a U-turn, and then turned onto Patchen Wilkes, parked, and waited until other officers arrived. Detective Johnson observed Officer Dellacamera stop Campbell's car.

Officer Dellacamera testified that he stopped the car for failure to signal prior to turning into the left turn lane and for illegal window tint. He testified that he believed the driver had seen his patrol car and was trying to get away from him when the car abruptly changed to the left turn lane. After stopping the car, Officer Dellacamera activated his body camera, and the government submitted the footage as an exhibit at the hearing.

Officer Dellacamera approached the car and informed Campbell, who was driving, that he stopped him because of the failure to use the turn signal and because of the window tint. Campbell gave Officer Dellacamera an instruction permit. Under Kentucky law, a driver with only an instruction permit must be accompanied by a 21-year-old licensed driver in the passenger seat. Ky. Rev. Stat. § 186.450(4)b). Officer Dellacamera asked if any occupant of the vehicle was 21 with a driver's license. None was.

Campbell told Officer Dellacamera that he was driving to look for a job. Officer Dellacamera asked Campbell where he had been. He said Walmart and Speedway. Officer Dellacamera did not believe this because Detective Johnson had informed him that the car came from the SureStay. Officer Dellacamera returned to his patrol car to run information about

Campbell and the car through police channels. Officer Dellacamera was informed that he would need to submit additional information on the stop because, according to police records, Campbell was a gang member.

Officer Dellacamera then returned to the vehicle and asked each occupant to exit one at at time. He spoke first with the passenger in the back seat with the red shirt. This passenger advised Officer Dellacamera that he and the other occupants of the car had been at the SureStay prior to the stop. Officer Dellacamera then asked Campbell to get out of the vehicle. Campbell stated that they had been at the Speedway to purchase gas prior to the stop. The individual in the passenger seat also stated that they had been at the Speedway prior to the stop.

According to the body camera footage, at this point, the stop had lasted about 23 minutes.

Officer Dawson was informed via police radio that Officer Dellacamera had stopped the vehicle. He arrived at the scene and spoke with Officer Dellacamera and then with Detective Johnson who told Officer Dawson he believed reasonable suspicion of drug activity existed. Officer Dawson took Ness to the car. Ness began sniffing in the front of the car and worked to the back. Officer Dawson testified that LPD canines are trained to continue sniffing an odor until they find the strongest source, at which point the canines should give the final response of sitting. Officer Dawson testified that Ness was "in odor" at the driver's door, and then followed that odor to the right rear passenger door, where he sat as his final response.

The officers then searched the car and found a firearm and marijuana in the center console.  Campbell is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and with possessing a firearm after being convicted of domestic violence in

violation of 18 U.S.C. § 922(g)(9).

## II.    Analysis

### A.  The Stop

"In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction [like a traffic violation] or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012); *United States v. Lambert*, 770 F. App'x 737, 739 (6th Cir. 2019). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *United States v. Johnson*, 242 F.3d 707, 709 (6th Cir. 2001) (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)). "Moreover, whether a traffic stop is reasonable does not depend upon the motivation of the officers." *Id*.

Kentucky law requires that a person give an appropriate signal before changing lanes. Ky. Rev. Stat. § 189.380(1); *Com. v. Fowler*, 409 S.W.3d 355, 360 (Ky. Ct. App. 2012). Neither Officer Dellacamera nor Detective Johnson saw Campbell use a turn signal before abruptly changing to the left turn lane on Winchester Road. Accordingly, probable cause existed for Officer Dellacamera's initial stop of Campbell's car.

Moreover, the officers also had a reasonable suspicion that the car had been involved in criminal activity. "Reasonable suspicion requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable

facts, he may conduct a *Terry* stop." *Lyons*, 687 F.3d at 763 (citation omitted). "It is well-established that an officer may conduct a stop based on information obtained by fellow officers." *Id*. at 765-66. "Variously called the 'collective knowledge' or 'fellow officer' rule, this doctrine recognizes the practical reality that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another." *Id*. at 766 (quotations and citation omitted). "Whether conveyed by police bulletin or dispatch, direct communication or indirect communication, the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion." *Id*.

Collectively, before stopping Campbell's car, the officers knew that 1) the car had just visited a hotel that had been the site of drug-trafficking activity in the past; 2) an informant, who had provided reliable information in the past, stated that drug-trafficking was occurring in a particular room at the hotel on the day the car visited it; 3) the informant stated that the occupant of the room had moved from a room in the front to a room at the back and that visitors arrived at the hotel, entered the room for short periods, and then left, which is consistent with drug activity; 3) Detective Johnson conducted surveillance and determined, based on his years of experience in investigating illegal drug activity, that the activity at the room was consistent with drug trafficking; 4) Campbell's car parked near that room and one of its occupants entered the room for a short period of time, returned to the car, and then entered the room again for a short period of time, which Detective Johnson knew was consistent with illegal drug activity; and 5) Campbell's car abruptly changed to the left turn lane when Officer Dellacamera pulled up behind

it in a patrol car.

These facts would lead to a reasonable suspicion that the occupants of the car had been involved in illegal drug activity.

In his post-hearing brief, (DE 27), Campbell argues that, in determining whether Officer Dellacamera had reasonable suspicion to stop Campbell's car, the Court can consider only what Officer Dellacamera knew at the time and not what Detective Johnson and Officer Dellacamera collectively knew. In support of that argument, he cites *United States v. Blair*, 524 F.3d 740 (6th Cir. 2008).

In that case, however, the court ruled that the collective knowledge of the investigating officer and the officer who conducted the traffic stop could not be considered because the officers did not make a "collective decision" to make the traffic stop. *Id*. at 752. Thus, the knowledge of the investigating officer could not be imputed to the arresting officer. *Id*.   In *Lyons*, the court explained, however, that "*Blair* stands only for the proposition that an officer who acts independently of another officers' request, and who acts in ignorance of any information that would establish reasonable suspicion, is not entitled to claim collective knowledge after the fact." *Lyons*, 687 F.3d at 768.

Here, however, the testimony established that Officer Dellacamera was not acting independently of Detective Johnson's investigation when he stopped Campbell's car. Detective Johnson contacted Officer Dellacamera before beginning surveillance, informed him of the investigation, and told Officer Dellacamera to be on standby. Detective Johnson later advised Officer Dellacamera that he believed the car was involved in drug-trafficking and advised him of

where the vehicle was traveling in order that Officer Dellacamera could stop the car. Officer Dellacamera then followed behind Detective Johnson who was directly behind Campbell.

The two had worked together similarly on other narcotics investigations. Detective Johnson asks Officer Dellacamera to conduct the traffic stops in such investigations because Detective Johnson does not have a vehicle equipped to make such stops and because he knows that Officer Dellacamera has experience conducting traffic stops related to narcotics investigations. Accordingly, to the extent that Detective Johnson failed to relay any information to Officer Dellacamera related to the detective's suspicion that Campbell's car had been involved in drug activity, that information can be imputed to Officer Dellacamera pursuant to the collective-knowledge doctrine.

Moreover, Campbell is incorrect that the only information that Officer Dellacamera had before he stopped the car was that Detective Johnson wanted him "to stop a black vehicle he saw at a hotel." (DE 27, Post-Hr'g Br. at 2.) Officer Dellacamera was at least aware that Detective Johnson was conducting an investigation of reported illegal drug activity at the hotel and that Detective Johnson suspected the car of being involved in that activity. He was aware that Detective Johnson had followed the car from the hotel to Winchester Road, where Officer Dellacamera then began following both cars. Officer Dellacamera was further aware that Campbell's car made an abrupt change to the left turn lane when the patrol car arrived behind him.

### B.  The length of the stop

The next issue is whether the traffic stop "was sufficiently limited in time and whether the investigative means were minimally intrusive." *United States v. Davis*, 430 F.3d 345, 355 (6th Cir. 2005) (quotations and citation omitted). "[T]he proper inquiry is whether the totality of the circumstances surrounding the stop indicates that the duration of the *stop as a whole* – including any prolongation due to suspicionless unrelated questioning – was reasonable." *United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010) (quotations and citation omitted).

After stopping Campbell, Officer Dellacamera quickly learned that Campbell had only an instruction permit and that no occupant was a licensed driver over the age of 21, which was another violation of state law.

Further, Campbell was not truthful about where he and the passengers had been just prior to the stop. Nor did his response to where he was traveling make sense. He said he was looking for a job but had turned into a residential area. Officers are permitted to inquire as to a driver's travel history and travel plans and the driver's authority to operate the car because such questions may help an officer verify or resolve his suspicions. *United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010).

After running Campbell through police channels, Officer Dellacamera was then informed that Campbell was a suspected gang member. When Officer Dellacamera inquired with each of the three occupants separately about where they had been prior to the stop, only one answered truthfully. Campbell continued to assert he had been at Speedway. According to the video and Officer Dellacamera, the stop had lasted approximately 23 minutes at this point. During that

time, Officer Dellacamera continued to obtain additional information that added to the original suspicions regarding drug activity and that justified further detention. The length of the stop up to this point was not unreasonable.

### C.  The dog sniff

 "Generally, a dog sniff does not require separate reasonable suspicion because it is not a search under the Fourth Amendment. If a dog sniff is conducted while someone is otherwise properly seized, such as in a lawful traffic stop, the dog sniff may render an otherwise lawful seizure unlawful only if it unreasonably prolongs the initial stop and the officer lacked an independent reasonable suspicion to extend the stop." *United States v. Stepp*, 680 F.3d 651, 663 (6th Cir. 2012) (citing *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)).

No testimony indicated that the dog sniff took an unreasonably extended period of time. There was no wait for the canine unit to arrive. Officer Dawson testified that Ness started at the front of the car and worked continuously toward the back until he gave a final positive response. "An alert to the presence of drugs by a properly trained narcotics detection dog is sufficient to establish probable cause to search a vehicle." *United States v. Sharp*, 689 F.3d 616, 618 (6th Cir. 2012). However, in order for a dog's alert to support a determination of probable cause, "the training and reliability of the dog must be established." *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir.1994).

Campbell argues that, because Ness gave a final positive response by the right rear door and the marijuana was ultimately found in the console, the dog's reliability was not established. Officer Dawson testified, however, that Ness is trained to sit as the final response at the point

11

where the odor is the strongest and that the wind that day could be the reason the strongest odor was at the rear of the car. Further, Officer Dawson provided extensive testimony regarding Ness's training and reliability. "The government need not produce actual certification records to establish the reliability of the dog; testimony about the dog's training and reliability suffices." *United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008).

Officer Dawson testified that the LPD purchases canines from vendors that the administration determines are reputable. The canines undergo a series of tests to determine if they meet the department's standards before the department purchases them. Officer Dawson testified that the canines may have no training, be partially trained, or be fully trained at the time the department purchases them. He testified that he was assigned Ness when he first came to the canine unit in 2018. Ness was partially trained at that time. He testified that he and Ness went through months of training by trainers certified in a variety of fields include obedience, narcotics detection, handler protection, and criminal apprehension.

After the initial months-long training, Officer Dawson and Ness continued weekly training throughout his time in the unit. In addition, the LPD certifies its canines annually through the North American Police Work Dog Association. Officer Dawson testified that, to be certified, the canine must correctly respond when sniffing multiple vehicles, homes, and outdoor locations, some of which contain narcotics, others of which do not. Ness had been most recently certified just a few months prior to the September 7, 2020 stop.

Officer Dawson's testimony sufficiently established Ness's training, certification, and reliability. Accordingly, after Ness gave a final positive response by the car, the officers had

probable cause to conduct the search.

### III.     Conclusion

For all these reasons, the Court hereby ORDERS that the motion to suppress (DE 14) is DENIED.

November 29, 2021

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY